**D. N. FLETCHER, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 53851.**

Court of Criminal Appeals of Texas.

March 9, 1977.

Murray L. Lieberman, Houston, for appellant.

Lynn Ingalsbe, Crim. Dist. Atty., and Jorge Solis, Asst. Dist. Atty., Abilene, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

This is an appeal from an order revoking probation.

On August 20, 1971, the appellant was convicted of check swindling.[1] Punishment was assessed at two years' confinement in the Texas Department of Corrections, probated. The order of probation contained, among others, the following terms and conditions:

"h. Pay his fine, if one be assessed, and all court costs whether a fine be assessed or not, in one or several sums, and make restitution or reparation in any sum the Court shall determine. Pay Court Costs of $17.

\* \* \* \* \* \*

"j. Pay $10 each month to the Adult Probation Officer for Probation Fee."

The record reflects that a copy of this order was timely delivered to appellant and explained to him by his probation officer.

On August 17, 1973, the State filed a motion to revoke appellant's probation, alleging, inter alia, as grounds therefor, the following:

---

1. This is the designation given the offense in the judgment, sentence, and other papers. The indictment fully charges an offense under Art. 567b, V.A.P.C. (1925), titled "Giving check, draft or order without sufficient funds." Cf. Art. 1545, V.A.P.C. (1925).

"(2) said probationer, D. N. Fletcher, failed to pay $10.00 each month to the Adult Probation Officer for Probation fee;

"(3) said probationer, D. N. Fletcher, failed to pay Court Costs of $17.00 as directed."

On June 16, 1976, a hearing was had on the State's motion to revoke. At the conclusion of this hearing, the court entered an order revoking the appellant's probation because it found that appellant had "...failed to pay $10.00 each month to the Probation Officer as probation fees as directed by the Court's order, and that the Probationer failed to pay the Court costs of $17.00 as directed by the Court's order, all of which is easily understood and was understood by the Probationer, and the Court further finds that all of the allegations were committed subsequent to the date of being placed on probation, and the Court is of the opinion that the probation should be revoked and the original judgment become operative."

Appellant contends, inter alia, that the trial court abused its discretion in revoking the appellant's probation in that the State failed to show that the appellant's failure to timely pay a $10 monthly probation fee and $17 court costs was willful and intentional, and that the appellant had the ability to make the payments when due. We agree and reverse.

At the hearing on the motion, the only testimony relative to the court's finding of probation violations came from Bill McCay, the appellant's probation officer. He testified as follows:

"Q  Okay. After that transpired did Mr. Fletcher thereafter pay his probation fees; that is, $10.00 each month after he was placed on probation for the two years?

"A  No, he did not.

"Q  Did you ever receive any money from him?

"A  Yes.

"Q  When?

"A  March 8th of 1976 we received a Western Union Money Order from Mr. Fletcher in the amount of—a total amount of $240.00 probation fees and $17.00 for Court costs.

"Q  All right.

"A  And we gave him a—returned to him a balance of $13.00 overpayment that he made.

"Q  Now, his probationary period would have expired on August 20th of 1973; is that correct?

"A  Yes.

"Q  Prior to August 20th of 1973, did you ever receive any monthly payments?

"A  None.

"Q  Did you ever receive the payment of $17.00 Court costs?

"A  No.

    \*     \*     \*     \*     \*     \*

"Q  Now, when was the next time after August 20th of 1971, that you heard from Mr. Fletcher?

"A  About the 1st of February of 1976, we received information that he was living in a small community, a suburb of Salt Lake City, Utah.

    \*     \*     \*     \*     \*     \*

"Q  Bill, sometime the first part of February (1976) you got a lead?

"A  Yes.

    \*     \*     \*     \*     \*     \*

"Q  After you got a lead, what did you do?

"A  We contacted the Sheriff's Department in Salt Lake City, Utah, and advised them that we had a warrant for Mr. Fletcher, and requested that they attempt to arrest him on a teletype warrant from us, and we did forward a warrant to them, along with Certified Copies of the Judgment, Indictment, all of the Court records on him.

"Q  And then extradition proceedings were begun?

"A  We were notified later to start extradition proceedings, that he was in custody.

"Q  All right. Then, did you actually have any contact—direct contact yourself with Mr. Fletcher?

"A   Yes, I did.

"Q   Okay.   About when was that?

"A   In February, I don't remember the date, I don't have it wrote down [sic], but he called me wanting to know what he could do to take care of this.   I advised him that he would have to appear in Court here, and he—

"Q   Let me stop you right there.   Was this before or after you had caused a warrant to be sent to Utah?

"A   After.

"Q   Could you tell was this a person to person or long distance phone call, or whatever?

"A   It was a long distance call.

\*     \*     \*     \*     \*     \*

"Q   Okay.   Well, could you just continue with the substance of what he did tell you in this conversation and what the conversation was about?

"A   Okay.   He wanted to know what it would take to get him out of this, and I advised him that he would have to appear in Court.   Then, he wanted to know how much money he owed and I gave him those figures, and, oh, probably a week or a week and a half we did receive the money from him.

"Q   Did he give any explanation to you of what he had been doing for four years, or why, or—

"A   No, he did not.   I didn't ask him. He stated that he was in business there *now* and had a good position and if he come [sic] back down that it would ruin his life.   (Emphasis added)

"Q   So, he was pursuing some sort of occupation?

"A   Yes.

"Q   And then that money was sent?

"A   Yes.

"Q   Was that the first contact you'd had from him since August 20th of 1971?

"A   Yes, it was."

On cross-examination, Mr. McCay further testified as follows:

"Q   I think you further told the Court a few moments ago that the only infor- mation you had, or the information you gathered, was from contacts, not going into the instance of the conversation, but it's from February of '76?

"A   Yes, that's true.

"Q   Okay.   You're not relating to the Court that any of that information per- tained to the period between August 20th of 1971 and August 20th of '73?

"A   We had no contact with him—

"Q   Okay.

"A   —or anyone else during that time.

"Q   So, you can't tell this Court then where Mr. Fletcher was between Au- gust of '71 and August of '73?

"A   No, I do not know."

In our recent decision of *Herrington v. State*, 534 S.W.2d 331 (Tex.Cr.App.1976), we quoted from our earlier opinion in *Hardison v. State*, 450 S.W.2d 638 (Tex.Cr.App. 1970), and stated that:

"Where probationary conditions relate to the payment of restitution and court costs there must be a showing at the revocation hearing of the probationer's ability to make the payments required and that the failure to make the restitu- tion was intentional (citation), and the failure to pay court costs was willful. (Citations).   We know of no reason why these requirements should not likewise apply to the payment of the supervisory or service fee authorized by Section 6a of Article 42.12, Vernon's Ann.C.C.P., as amended 1967." *Id.*, at 333.

We held in *Herrington* that:

"In the absence of a showing of appel- lant's ability to make the payments re- quired, and that his failure was intention- al, the court abused its discretion in re- voking probation based on failure to make the required payments." *Id.*, at 334.

In the case at bar, as in *Herrington* and *Hardison*, there was no showing that appel- lant had the ability to make the payments required and that the failure to make such payments was intentional.

The judgment of the trial court is re- versed and the cause remanded.