

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-10-00516-CR

SANDRA BROWN                                                    APPELLANT

V.

THE STATE OF TEXAS                                                   STATE

----------

### FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

In this case we are asked whether, in the light most favorable to the trial court's ruling, the prosecution proved by a preponderance of the evidence that Appellant Sandra Brown violated the conditions of her deferred-adjudication community supervision. One of us thinks, quite reasonably, that the prosecution

---

[1]*See* Tex. R. App. P. 47.4.

did not prove its case; two of us think it did—but just barely. We all agree, however, that the trial court had to work to connect the dots.

## Procedural Background

Appellant had negotiated a plea bargain agreement for eight years' deferred adjudication community supervision in exchange for her pleading guilty to aggravated assault. Four years into her term, the State moved to adjudicate, alleging that she had failed to pay one month's required community supervision fee and that she had committed new offenses. After a contested hearing, the trial court sustained the latter allegation, finding that she had committed a new offense, and granted the State's motion to adjudicate. That ruling is the subject of this appeal.

## Standard of Review

We review an order revoking community supervision under an abuse of discretion standard. *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006); *Cardona v. State*, 665 S.W.2d 492, 493 (Tex. Crim. App. 1984). In a revocation proceeding, the State must prove by a preponderance of the evidence that the defendant violated the terms and conditions of community supervision. *Cobb v. State*, 851 S.W.2d 871, 873 (Tex. Crim. App. 1993). The trial court is the sole judge of the credibility of the witnesses and the weight to be given their testimony, and we review the evidence in the light most favorable to the trial court's ruling. *Cardona*, 665 S.W.2d at 493; *Garrett v. State*, 619 S.W.2d 172, 174 (Tex. Crim. App. [Panel Op.] 1981). If the State fails to meet its burden of

proof, the trial court abuses its discretion by revoking the community supervision. *Cardona*, 665 S.W.2d at 493–94.

## Discussion

### *Community Supervision Fees*

The State first argues that there is sufficient evidence in the record for us to uphold the trial court's ruling based upon the allegation that Appellant failed to pay her fee, with the implication being that we could simply modify the trial court's judgment to reflect that the trial court sustained on this allegation rather than on the allegation that she committed a new offense.[2] The evidence, however, even beneath the light-most-favorable, does not lead us to so hold.

At the hearing on the State's motion to adjudicate, Chris Alexander testified that he supervised a probation officer named Rhett Wallace, that he ensured Wallace managed his files and probationers, that he was familiar with Appellant's case, and that he had reviewed her file. He testified that a motion to adjudicate had been filed against Appellant, alleging that she had not paid a supervision fee for June 2005, that this allegation was the only one with which Alexander's department was directly involved, and that "[t]he only technical

---

[2]Errors in the trial court's order may be modified on appeal if the reviewing court has the necessary data and evidence to do so. Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Maddox v. State*, No. 02-08-00020-CR, 2009 WL 213715, at *3 (Tex. App.—Fort Worth Jan. 29, 2009, no pet.) (mem. op., not designated for publication). The judgment in this case does not include a finding that the failure-to-pay allegation is true.

violation she has is the one non-payment." The State presented no other evidence on the issue.

To prove that a probationer failed to pay a community supervision fee, the State must show by a preponderance of the evidence that the probationer had the ability to pay but did not pay as ordered by the trial court. Article 42.12, section 21(c) of the code of criminal procedure reads in pertinent part,

> In a community supervision revocation hearing at which it is alleged only that the defendant violated the conditions of community supervision by failing to pay . . . community supervision fees . . . the state must prove by a preponderance of the evidence that the defendant was able to pay and did not pay as ordered by the judge.[3]

Tex. Code Crim. Proc. Ann. art 42.12, § 21(c), as amended by Act of June 15, 2007, 80th Leg., ch. 604, § 1, eff. Sept. 1, 2007; *see Sherwood v. State*, No. 10-09-00114-CR, 2010 WL 1611063, at *1 (Tex. App.—Waco Apr. 21, 2010, pet. ref'd.) (mem. op., not designated for publication) ("Under . . . [art. 42.12, section 21(c) as currently written,] the State must prove that the defendant had the ability to pay and did not pay the court-ordered . . . community supervision fees . . . ."); *Hood v. State*, No. 12-08-00366-CR, 2009 WL 4981459, at *2 (Tex. App.—Tyler Dec. 23, 2009, no pet.) (mem. op., not designated for publication) (recognizing

---

[3]The legislature's use of the word "only" in the statute is not intended to lift the requirement that the State prove that the probationer was able to pay and did not pay as ordered by the judge when the State includes additional allegations of nonmonetary community supervision violations. *See Stanfield v. State*, 718 S.W.2d 734, 737 (Tex. Crim. App. 1986) (holding that such a construction "produces quirky consequences").

4

that 2007 amendments to article 42.12, section 21(c) changed "defendant's 'ability to pay' from an affirmative defense to something the state must show").

The State must also prove that the probationer's failure to pay was intentional. *Stanfield*, 718 S.W.2d at 736 (stating that "nonpayment of fees must be intentional"); *Fletcher v. State*, 547 S.W.2d 634, 636 (Tex. Crim. App. 1977).

The State offered no evidence to show nor did it argue that Appellant was able to pay her June 2005 fee as ordered by the trial judge or that her failure to pay was intentional. Accordingly, the trial court properly did not base its judgment on a finding that Appellant failed to pay her community supervision fees, and the record does not support our reforming the judgment to reflect such a finding.

### New Offense: Fraudulent Use of Identifying Information

The State argues in the alternative that the evidence is sufficient to support the trial court's finding that Appellant committed a new offense. This is where the trial court had to connect some dots, and in the light most favorable to the trial court's ruling, the State's argument narrowly prevails.

In its motion to adjudicate, the State alleged that Appellant committed multiple fraudulent-use-of-identifying-information offenses. *See* Tex. Penal Code Ann. § 32.51, as amended by Act of June 15, 2007, 80th Leg., ch. 631, § 1, eff. Sept. 1, 2007. Specifically, the allegations included that

> [Appellant] violated said term and condition in that on or about March 2, 2009, in Johnson County of the State of Texas, she did then and there [with] intent to defraud or harm another, and without

5

the consent of Ben Fruin, use identifying information of Ben Fruin, to-wit: name and Bank of America checking account number.

At the hearing on the motion to adjudicate, the State called Renae Fruin, who testified that she and the complainant, her husband Ben Fruin, jointly own her company's business checking account. State's Exhibit 1 is a collection of bank records showing transactions made on a Bank of America business economy checking account with a "check card" ending in "5001." Renae identified State's Exhibit 1 as printouts of unauthorized transactions made against the account.

Appellant concedes that Renae's testimony established that *someone* charged items against Renae's and Ben's account without *Renae's* permission, but she asserts that it did not establish that the charges were made without *Ben's* permission. Before Renae testified, however, Johnson County Sheriff's Detective Leona Yocham testified that Ben reported that "he was having unauthorized uses of his debit card." Moreover, Renae testified as follows:

> Q. And did anyone have the permission of the business, yourself, *or your husband* to use your account information to make these purchases?
>
> A. No, sir.

[Emphasis added.] Viewed in the light most favorable to the trial court's ruling, the evidence in the record established that neither Renae nor Ben authorized the charges.

6

We now turn to the bulk of Appellant's argument, which is her claim that the evidence does not tie her to any transactions debited against the Fruins' account. As stated above, State's Exhibit 1 is a collection of documents showing charges posted to the Fruins' account that Renae testified were unauthorized. Among the many unauthorized charges, is one posted on March 11, 2009, for $132 to "BMC, METRO PCS." State's Exhibit 2 consists of records from Metro PCS, Inc., showing payment by a Visa card ending in "5001" that was made on March 10, 2009, at 12:01 a.m. for a account number 2148533220000010600 8619521. The payment came in by telephone and was made from a telephone with the number 214-853-3220. State's Exhibit 2 also includes detailed information pertaining to that account and phone number. On April 9, 2008, a cell phone with phone number (214) 853-3220 was activated and subscribed to by "Sandy Brown," whose date of birth is May 11, 1979, and whose address is listed as 143 Evergreen Circle, Arlington, TX 76011-6210.

Noting that this cell phone account "appears to be for a Sandy" but not "Sandra" Brown, Appellant asserts that no evidence was "ever introduced" that the account is "connected to Appellant in any manner." She is incorrect. State's Exhibit 14 is a record of search results from pawn shop transactions across the state. The exhibit shows that on May 31, 2009, "Sandra Le Brown" pawned a television set at First Cash Pawn No. 08 in Dallas. In addition to name, driver's license number, and physical description, the customer identification information included date of birth, address, and telephone number. The Sandra Brown who

7

pawned a television on that date at that pawn shop gave her address as "143 Evergreen Circle, Arlington, TX 76011," her date of birth as "5/11/1979," and her telephone number as "214-853-3220."

Given evidence that "Sandy Brown" and "Sandra Brown" have identical addresses, dates of birth, and telephone numbers, the trial court could reasonably conclude that they are the same person.

To summarize the evidence so far:  on or about March 10, 2010, someone used Appellant's cell phone to pay Appellant's cell phone bill by charging Ben Fruin's Bank of America checking account without permission.  Appellant's remaining contention is that the evidence does not prove that she is that someone.

We would agree with Appellant if the State's burden of proof had been beyond a reasonable doubt.  But we think that, when viewed in the light most favorable to the trial court's ruling, the evidence supports a reasonable conclusion that Appellant more likely than not used her own cell phone to pay her own cell phone bill.  In addition, there is other evidence in the record to support a reasonable inference that she fraudulently used the Fruins' account number.

State's Exhibit 1 shows a score of individual transactions charged to the Fruins' account in the first half of March 2009.  Renae testified that these transactions were unauthorized and that their dollar value was in the thousands.  Some of the higher-value transactions included $592.98, $409.96, and $502.98 paid to Newegg.com for electronics, including two high-definition televisions and

8

a computer. All three of these items were ordered within three days of each other and were shipped to a "James Fruin" at two different addresses. The computer went to the Arlington home of Joyce Woodard; the televisions to an apartment in Grand Prairie belonging to Stephanie Williams. James Fruin is a distant relative of Ben's, but the two do not speak and have not been in contact for some time. Renae testified that she does not know either Woodard or Williams. On the other hand, the record shows that Woodard is a "very close friend" of Appellant's family, and that the Johnson County Sheriff's Department made initial contact with Appellant through information provided by Williams.

Other items charged to the Fruins' account during the same three days were sent to "James Fruin" at Williams's apartment, including two men's rings from Overstock.com at a cost of $293.76.

One or both of these rings was apparently pawned by Appellant's cousin, Jamall Brown, who was a frequent customer of pawn shops across the state.[4] When Jamall's pawning travels brought him to Dallas in the early part of 2009,

---

[4]Regarding Jamall's statewide pawning activity, the record showed the following: On October 4, 2008, he pawned a laptop computer with charger at Top Dollar Pawn in Bryan; on October 27, 2008, a car speaker at Gold'N'Dollar Money Mart in Houston; on November 13, 2008, a lady's fashion ring at EZPawn in Bay City; on November 19, 2008, a gold chain at EZPawn in Baytown; on November 21, 2008, a digital camera at the Baytown EZPawn; on December 30, 2008, a laptop computer at Cash America in Houston; on February 11, 2009, a portable MP3 player at Cash America No. 5 in Dallas; and at that same Dallas Cash America, a laptop computer on March 30, 2009.

9

the record shows that on March 2, his cell phone bill was paid—as Appellant's was on March 10—with the Fruins' account number.

The record also indicates that Appellant accompanied her cousin Jamall on two of his visits to Dallas pawn shops. When he pawned the men's fashion rings purchased with the Fruins' account number from Overstock.com, the record shows that three minutes later, she pawned a portable MP3 player for $60 at the same store. The record also shows that the next week at this store, Appellant pawned a ladies' fashion ring just four minutes before Jamall pawned the other men's ring purchased with the Fruins' account number.[5] Finally, the record shows that on March 30, 2009, Jamall pawned a laptop computer at this store, and the next day, Appellant pawned a television at a different Dallas pawn shop, First Cash Pawn No. 8.

Within the span of a couple of weeks in March 2009, the Fruins' account was charged for:

- Appellant's cell phone bill, which was paid using Appellant's cell phone;
- Appellant's cousin's cell phone bill;

---

[5]Both of the items Appellant pawned were similar to items Jamall had pawned in the past. On November 13, 2008, he had pawned a lady's fashion ring in Bay City, Texas; and a month before she pawned an MP3 player at the Cash America in Dallas for $60.00, he had pawned an MP3 player at that store for $60.00.

- men's and women's jewelry and a number of high-dollar electronics products including televisions and computers, which were shipped to addresses belonging to Appellant's friends in the name of Ben Fruin[6] or a distant relative with whom Ben had no contact.

Given Jamall's history of pawning jewelry and electronics across the state, and given that Appellant pawned similar items within minutes of his pawning items charged to the Fruins' account, we hold that the evidence, viewed in the light most favorable to the trial court's ruling, is sufficient to show that it is more likely than not that Appellant violated the conditions of her community supervision by fraudulently using Ben Fruin's account number. Specifically, from the direct and circumstantial evidence presented in this case, the trial court could reasonably have concluded that while participating in a scheme to fraudulently use Ben Fruin's account number to purchase items for her own use or for resale at pawn shops, Appellant also charged her cell phone bill to his account. *See Cobb*, 851 S.W.2d at 873; *Cardona*, 665 S.W.2d at 493; *Garrett*, 619 S.W.2d at 174. Accordingly, we overrule Appellant's sole issue.

---

[6]State's Exhibit 3 includes documentation from Zappos.com showing an order for a Soho document case priced at $140.22 placed on the evening of March 7, 2009, and shipped to "Ben Fruin" at Stephanie Williams's Grand Prairie apartment. State's Exhibit 1 shows a posting to the Fruins' account number in the amount of $140.22 paid to Zappos.com on March 9, 2009.

## Conclusion

Having overruled Appellant's sole issue, we affirm the judgment of the trial court.

LEE GABRIEL
JUSTICE

PANEL:  DAUPHINOT, GARDNER, and GABRIEL, JJ.

DAUPHINOT, J. filed a concurring and dissenting opinion.

PUBLISH

DELIVERED:  November 17, 2011



# COURT OF APPEALS
**SECOND DISTRICT OF TEXAS**
**FORT WORTH**

## NO. 02-10-00516-CR

SANDRA BROWN                                                          APPELLANT

V.

THE STATE OF TEXAS                                                        STATE

----------

FROM THE 211TH DISTRICT COURT OF DENTON COUNTY

----------

## CONCURRING AND DISSENTING OPINION

----------

I agree that the State did not prove that Appellant had the ability to pay but intentionally failed to pay her community supervision fee. Respectfully, however, I cannot agree with the majority that the State proved that she committed a new offense while on community supervision, no matter how hard I stretch to connect the dots.

The State alleged that Appellant, on or about March 2, 2009, with "intent to defraud or harm another, and without the consent of Ben Fruin, [did] use

identifying information of Ben Fruin, to-wit: name and Bank of America [BOA] checking account number."

The real problems with this case stem from the inability of the State to tie Appellant to any transactions debited against Ben's account. Someone paid Appellant's cellular phone bill over the telephone. There is no indication who paid the bill or whether the person was male or female. The evidence shows only that bank records reflect an online BOA banking transaction showing a charge that Ben's wife said was unauthorized. The Metro PCS records show payment by a Visa card ending in "5001," the last four numbers of the Fruins' check card number. And, although cell phone records connected to the cell phone bill show that the phone was activated and subscribed to by "Sandy Brown," there is no proof that Appellant used that phone to pay the cell phone bill; no proof that Appellant knew that the Fruins' checking account was being tapped to pay the bill; and no proof that Appellant knew that any unauthorized charge was made to pay the bill. There is no evidence that Appellant committed any act with intent to defraud or harm another or that she used Ben Fruin's name or BOA checking account number. If someone borrows my car and uses a stolen credit card to buy gasoline for it without my knowledge, am I guilty of credit card abuse?

The majority manages to connect the dots in this way:

1. Someone used Ben Fruin's Visa card to pay the bill for a cell phone listed as belonging to Sandy Brown.

2

2. Pawn shop records show that Sandra Le Brown pawned a television in Dallas.

3. The pawn shop records and cell phone company records show that Sandy Brown and Sandra Le Brown have the same date of birth, address, and telephone number.

4. Therefore, the majority concludes, Appellant is the person who paid the cell phone bill because:

   A. Other items were purchased and charged to the Fruins' account and shipped to Ben Fruin's distant relative James Fruin, with whom he does not speak and has had no contact, at two different addresses;

   B. The addresses to which the James Fruin purchases were shipped were that of Joyce Woodard, "a very close friend" of Appellant's family, and Stephanie Williams, who provided information to the Johnson County Sheriff's Department that allowed them to contact Appellant;

   C. Appellant's cousin Jamall Brown often frequented pawn shops and pawned a ring shipped to James Fruin at Williams's apartment and charged to the Fruins;

   D. Cousin Jamall's own cell phone bill was paid out of the Fruins' account;

   E. Appellant sometimes accompanied Jamall to pawn shops to pawn things. She was at the pawn shop when he pawned the ring;

   F. Given Cousin Jamall's "history of pawning jewelry and electronics across the state, and given that Appellant pawned similar items within minutes of his pawning items charged to the Fruins' account," Appellant and not Cousin Jamall or James Fruin used Ben Fruin's name and bank account number with intent to harm and defraud someone because she, and no one else, must have paid the cell phone bill. Or perhaps Appellant was a party because, with intent to harm and defraud someone else, she solicited, encouraged,

3

directed, aided, or attempted to aid Cousin Jamall and James to use Ben Fruin's name and bank account number.[7]

Yet the record contains no evidence that Jamall or James lacked Ben's consent to use the Visa card or to use his name and account number.

The State was required to prove that Appellant, with intent to harm or defraud another, and without the consent of Ben Fruin, used his identifying information—specifically, his name and BOA checking account number. The State did not prove by a preponderance of the evidence that Appellant did any of these things. The only expenditure connected to Appellant was the payment of her cell phone bill. There is no evidence who paid it or that she knew it was paid in any way connected to Ben Fruin. Consequently, there is no evidence of her intent to harm or defraud any person. There is no evidence that she used Ben Fruin's name. There is no evidence that she used his BOA checking account number. If she was found to have acted as a party, there is no evidence that, with intent to harm and defraud someone else, she solicited, encouraged, directed, aided, or attempted to aid Cousin Jamall or James to use Ben Fruin's name or bank account number. Further, there is no evidence that either Cousin Jamall or James did not have consent to use the Visa card or to use Ben Fruin's name or bank account number.

I agree that the State did not prove Appellant's failure to pay her community supervision fee. But I cannot agree that the State succeeded in

---

[7]*See* Tex. Penal Code Ann. § 7.02(a) (West 2011).

4

proving that Appellant committed the new offense alleged in the petition.  I would therefore reverse the trial court's judgment and remand this case.  Because the majority does not, I must respectfully dissent.

LEE ANN DAUPHINOT
JUSTICE

PUBLISH

DELIVERED:  November 17, 2011